56 CCPA

**Application of Samuel R. STILES.**
**Patent Appeal No. 8060.**

United States Court of Customs and Patent Appeals.

April 3, 1969.

---

Arnold G. Gulko, Washington, D. C. (John C. Quinlan, New York City, Dressler, Goldsmith, Clement & Gordon, Chicago, Ill., of counsel), for appellant.

Joseph Schimmel, Washington, D. C., for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and KIRKPATRICK,* Judges.

ALMOND, Judge.

This appeal is from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of all the claims remaining in appellant's application entitled "Treatment of Hydrocarbon Materials." [1]

The sole issue is whether appellant's claimed invention is obvious and hence unpatentable under 35 U.S.C. § 103.

The invention relates to a process for treatment of feed material to be used in an alkylation process such as may be performed at a refinery to provide high quality fuel. More particularly, this invention relates to the treatment of feed material to the reaction of an isoparaffin with an olefin in the presence of an acid catalyst (such as $H_2SO_4$). The feed material to this alkylation process may be obtained from fractionating, cracking, reforming, coking, and other means of processing crude refinery cuts, such as light naphtha, gasoline, kerosene and similar fractions to obtain most preferably the $C_3$ to $C_5$ fractions. Unfortunately, certain sulfur, oxygen and nitrogen contaminants are usually associated with the feed materials thus produced. The specification of appellant's application discloses that these contaminants include hydrogen sulfide and mercaptan contaminants as well as "natural contaminants comprising carbonyl sulfide and carbonyl sulfide-ammonia complexes * * * found in cracking products in many cases." The contaminants degrade the subsequent alkylation process in a number of ways, such as by poisoning the acid catalyst, by causing gummy materials which clog the process apparatus or by highly corrosive effects on the apparatus.

Appellant has discovered that these undesirable contaminants may be removed by treating the alkylation feed material, which is in the $C_3$–$C_6$ hydrocarbon range, with a washing medium comprising a solution of caustic hydroxide in water in which

(1) the concentration of hydroxide in solution is at least 18%, and

(2) the concentration of salt contaminant in the washing medium is controlled to below 0.5%.

All the appealed claims recite at least all of the limitations just described, claim 3 being the broadest:

3. A method for preparing alkylation feed stock which comprises: washing with a solution of alkaline material a hydrocarbon fraction containing predominantly $C_3$ to $C_6$ hydrocarbons and a minor amount of a contaminant boiling within the $C_3$ to $C_6$ hydrocarbon range and containing carbonyl sulfide, said contaminant forming a salt upon contract with the alkaline material and being selected from the group consisting of oxygen-, sulfur- and nitrogen-containing contaminants, said solution of alkaline material selected from the group consisting of hydroxides of sodium, lithium and potassium and wherein the concentration of the hydroxide in solution is at least 18 per cent and controlling the concentration of the salt

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Serial No. 172,800, filed February 12, 1962.

contaminant in the washing medium below about 0.5 per cent; washing said hydrocarbon fraction to produce an alkylation feed stock containing less than a few parts per million of contaminant so that the resulting feed stock is capable of producing an alkylate product of improved lead susceptibility and ASTM end point.

The following references were relied on before the board:

| | | | |
|---|---|---|---|
| Goodman et al. (Goodman) | 3,011,970 | Dec. 5, 1961 | |
| Betts et al. (Betts) | 2,769,765 | Nov. 6, 1956 | |
| Herthel | 2,374,996 | May 1, 1945 | |
| Retailliau | 1,936,210 | Nov. 21, 1933 | |

Although we shall refer to these references in more detail later, their teachings may be briefly summarized as follows:

Herthel discloses an alkylation process to provide high quality fuel utilizing feed material products, obtained by a cracking operation, containing generally the same range of carbon atoms as appellant's feedstock. Herthel teaches caustic washing of this feed material prior to the alkylation step, as follows:

If the product contains any substantial amount of sulfur, it may be passed through the line 20 to the hydrogen sulfide removal tower 22 and thence to the caustic wash apparatus 24 for removal of mercaptans, although either or both of these operations may be omitted if unnecessary. The liquid, with or without appropriate purification, is divided at the point 26 (or, if purification is unnecessary, the point 27) into two portions. Instead of treating all of the hydrocarbon to remove sulfur, such treatment may be applied to one or the other (or both) of the divided streams, usually that fed to the alkylation unit. * * *

Retailliau discloses treatment of a cracked distillate with caustic soda in a range of concentration from 30%–40% Baume (25%–40%) to remove acidic impurities. Retailliau states:

The cracked distillate, free from the hydrogen sulphide content, is then contacted with caustic soda of relatively high concentration, such, for example, as from 30° to 45° Baume, for a sufficient length of time to remove all acidic compounds and to cause some compounds to polymerize. The treatment with caustic soda of relatively high concentration also tends to break up possible esters formed during the cracking reaction by the action of the organic acids and bases. After the material has been subjected to the caustic soda treatment, and allowed to settle, it is subjected to a water wash until all traces of the alkali are removed.

Betts discloses a "sweetening" process for the removal of mercaptan impurities from petroleum fractions by using a caustic wash. Periodically the spent wash is regenerated by removal of the mercaptan salts from the caustic wash. Betts contains the following statement:

The art has generally recognized in the treating of hydrocarbon streams with aqueous solutions such as strong or weak caustic in a continuous type process, that the equilibrium is generally unfavorable for mercaptan extraction. Therefore, caustic solutions when they are only spent to a small extent in mercaptide salts will not give any further reduction in mercaptan content despite the fact that these treating solutions have a large residual-free caustic content. The art has also recognized that the efficiency of the spent caustic can be partially or fully restored by regeneration of these solutions. The regeneration normally consists of removal of a part or all of the mercaptide salts by means of hy-

drolysis and vaporization or by oxidation.

Goodman discloses caustic washing applied to a large range of hydrocarbon feeds.

The rejection of the claims is under 35 U.S.C. § 103 as being unpatentable over Herthel in view of Retailliau. According to the examiner, Herthel discloses caustic washing of cracked distillate containing $C_3$ and $C_4$ olefins prior to an alkylation step and it would be obvious to use appellant's concentration of caustic in such a process in view of Retailliau's teaching of the use of caustic in a concentration from 25%–40%. As to the claim limitation concerning the level of contaminant in the caustic wash, the examiner pointed to Betts, stating "[i]t would involve nothing more than routine experimentation to determine the precise level of contaminant-salt concentration which could be tolerated in any particular process."

The board agreed with the examiner on the correctness of combining the teachings of Herthel and Retailliau to suggest the overall steps of appellant's process as well as the first limitation concerning the claimed range concentration of caustic in the wash. As to the second limitation of the claims concerning the level of contaminant in the wash, the board did not discuss Betts but instead referred to Retailliau, stating in its original decision:

> After the alkali treatment [of Retailliau] the products are subjected to wash water until all traces of alkali are removed, page 2, lines 126 to 129. The washing or removal of the contaminants obtained by the alkali treatment to a concentration of below 0.5%, as recited in the claims, is considered obvious. It would appear that the washing of the product by Retailliau to the extent indicated would substantially remove the contaminants.

Further the board stated:

> Appellant argues that he has produced an alkylation feedstock containing less than a few parts per million of contaminant. We consider that the process of Herthel, subjected to the further treatment of Retailliau using the concentration of caustic and the complete washing disclosed in this reference would substantially give a product having the low contaminant content recited in the claims.

In a subsequent decision on reconsideration, the board stated that it relied on the reasons stated by the examiner concerning the salt contaminant concentration in the washing medium.

On reviewing the record we are inclined to agree with the first portion of the board's reasoning, namely, that the combined teachings of Herthel and Retailliau would make it obvious to one skilled in the art to wash a prealkylation feed material obtained by cracking and containing hydrocarbon fractions within the $C_3$–$C_6$ range, with a caustic hydroxide solution containing at least 18% of caustic. Such combined teaching, however, does not render obvious the invention defined in the claims, which requires that the concentration of the salt contaminant in the washing medium should be controlled "below about 0.5 per cent."

It is therefore to this second limitation regarding the concentration of salt contaminant in the caustic washing medium that our attention must be directed. So far as the board's finding of relevant teaching for this limitation in Retailliau is concerned, appellant argues that the board misapplied Retailliau by confusing the concentration of contaminant salt in the caustic treating solution (recited in appellant's claims) with the complete removal of the caustic treating solution from the treated hydrocarbon (taught by Retailliau). In this connection, appellant's brief states:

> There is certainly no basis to believe that ordinary water can remove an impurity which the invention has found cannot be removed by caustic washing unless the concentration is above 18% and which is even then ineffective unless the contaminant salt

*concentration in the caustic solution is minimized to a level below 0.5%.*

If we assume for sake of discussion that the Retailliau concentrated caustic treatment is used in the process of Herthel, the only basis to conclude that the result would provide the low contaminant content recited in the claims is to assume that Retailliau also teaches the use of low salt concentration in the caustic wash, but there is no such teaching and the Board's decision makes it clear that they were confused and thought that the teaching to wash with water to remove alkali was the same as the teaching to wash with concentrated caustic substantially free of salt as required by the claims. Of course, this cannot be the case for water per se cannot be expected to extract something which even dilute caustic cannot extract and which concentrated caustic containing salts has left behind.

On this point we think appellant is correct and that the board clearly erred in the manner he points out.

The next step in our inquiry, therefore, is to review the examiner's position, adopted by the board on reconsideration, and apply the Betts reference in connection with the limitation of the claims concerning the level of salt contaminant in the wash medium. Betts teaches regeneration of spent caustic, as indicated in the previously quoted portion from Betts, but the level of salt contaminant tolerated in the caustic treating solution while it is in use, is not entirely clear. At one treating zone (identified as Zone 1 in the Betts patent) the cracked hydrocarbon oil to be treated is washed with initially fresh NaOH solution which is recirculated. The patent discloses:

> The spent caustic containing the mercaptans and phenols is removed from zone *1* by means of line *5* and recirculated by means of line *6* until about 10–90% spent of free caustic. * * *

From this disclosure it would appear that the level of contaminant salt in the recirculated fluid could possibly vary from an initial 0% up to 90% of the free caustic over a period of time. This would certainly not seem to amount to a teaching of "*controlling* the concentration of the salt contaminant in the washing medium below 0.5%."

At another point in the Betts process (identified as Zone B in the patent) an NaOH treating solution is applied to virgin naphthas. Betts discloses:

> A typical analysis of the solution utilized in zone *13* for the treatment of virgin naphthas is free NaOH 20%, alkali metal soaps of aromatic mercaptans and phenols 35%, water 45% by weight.

Thus the teaching to be derived from this second portion of Betts is the use of a caustic treating solution in which the level of alkali metal soaps of aromatic mercaptans and phenols is 35%.

Furthermore, it is plain that the invention of Betts was directed solely to the removal of mercaptan compounds as contaminants. However, these do not appear to be the only significant contaminants in the feed material treated by appellant which appellant removes by his process.[2]

---

2. In his specification, appellant states:

The alkaline wash material used in the pretreatment of feeds in the present invention is preferably an aqueous caustic solution of from 18 per cent to 50 per cent concentration, containing not more than 0.5 per cent salts of the acid gases such as sulfides, carbonates, etc., and most preferably containing none of these salt impurities. The hydrocarbon fractions may contain acid gases such as hydrogen sulfide, carbon dioxide, etc., which, when extracted with caustic, produce the corresponding salts. *These salts interfere with the extraction or dissolution of other contaminants such as mercaptans, carbonyl sulfides, ammonium complexes, etc. Therefore, it is important to maintain the salt concentration below about 0.5 per cent in order that these salts do not reduce or interfere with the efficiency of the extraction of these* deleterious contaminants and to prevent "salting out" or inability to extract the weaker acids from the feed stock. [Emphasis supplied.]

For the foregoing reasons, we think it apparent that Betts, with its disclosed tolerance of relatively high values of, and wide variations in, salt content in the alkaline wash, fails to suggest the upper limit of 0.5 per cent required by the claims.

The decision of the board is therefore reversed.

Reversed.

WORLEY, C. J., and KIRKPATRICK, J., took no part in the decision of this case.